## LAURA CONLEY v. LOUIS F. DOW COMPANY.[1]

June 25, 1915.

Nos. 19,267—(170).

**Death of servant — unsafe place of work — verdict not excessive.**

In an action brought against a master to recover damages for causing a servant's death through neglect to provide and maintain a reasonably safe place wherein to work, it is *held:*

(1) The defendant's negligence, as well as the defenses of contributory negligence of the deceased, his assumption of the risk, and the negligence of a fellow servant being the proximate cause of death were, upon the evidence, issues for the jury, submitted under appropriate and correct instructions.

(2) The portion of the charge upon which error is assigned, does not merit criticism when read in its proper connection.

(3) The verdict is not excessive.

Action in the district court for Ramsey county by the administratrix of the estate of James Conley, deceased, to recover $7,500 for the death of her intestate. The case was tried before Olin B. Lewis, J., who at the close of plaintiff's testimony denied defendant's motion to dismiss the action, and a jury which returned a verdict for $4,300. From the order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Watson & Abernethy,* for appellant.

*Duxbury, Conzett & Pettijohn,* for respondent.

HOLT, J.

Action to recover damages for the death of plaintiff's intestate caused by defendant's negligence. This appeal is from an order denying defendant's motion in the alternative for judgment notwithstanding the verdict or a new trial.

The defendant, a corporation, on September 20, 1913, conducted a wholesale and retail furniture, stationery, office and bank supplies

[1] Reported in 153 N. W. 323, 593.

business in a six story and basement building, fronting Jackson street, in St. Paul, Minnesota. The basement was about 50 by 90 feet in area, and about 12 feet deep. Two repair shops, each 12 by 18 feet in dimension, fronting Jackson street, were lighted and ventilated by windows of the usual type, extending up to the display windows on the first floor. The sidewalk covering the small area in front of these windows consisted of opalescent glass set in iron frames. To the north of these shops were the heating boilers, set in a pit some two feet lower than the basement; this pit extended some six feet in front of the boilers. West of the boilers along the north wall of the basement, a stairway led to the first floor. To the rear and south of the stairway was a freight elevator. The space to the west of the shop rooms and to the south of the stairway and elevator was filled with furniture, to a large extent, packed in burlap and excelsior. And although there were windows and exits to the alley in rear, or west, they were closed and inaccessible, by reason of the stored furniture. From the stairway and elevator leading to the shops a four foot passageway was maintained, which was also used to unpack and polish the furniture before sending it out. One of the shops was used to repair and repolish furniture. Over a hundred men were employed in the building, but only three or four in the basement. Small quantities of benzine and like inflammable liquids were kept in the shops and mixed and used for polishing purposes as occasion required. Waste material from the printing establishment on the two upper floors was brought to the basement and burned in the boilers. Plaintiff's intestate began to work for defendant as day janitor and fireman in the summer of 1913. September 20, 1913, was cold, and the heating plant was started. The windows in the shops were wholly or partly closed because of the cold. In the morning the elevator operator brought down a quantity of refuse from the printing department and dumped it in front of the boilers. It is claimed that therein were rags saturated with gasolene and oil. During the forenoon, and up until one or two o'clock in the afternoon, desks were unpacked and polished in the passageway in the basement. Sacks of waste paper were piled under and alongside the stairway. About 2:45 p. m. James Conley, plaintiff's intestate, was

seen raking ashes from the ash pit into the depression in front of the boilers.   In the ashes were live coals, which caused considerable smoke.   Some 15 minutes thereafter Conley rushed into the repair room where was a fire alarm box and turned in the alarm.   Immediately the three men, then in the front of the basement, sought to escape by the stairway.   The fire, however, seemed to be a flame of burning air sweeping the ceiling towards the stairway and elevator. Near the upper part of the stairway were doors, swinging into the basement and kept closed by weights.   This impeded a hurried exit.[1] One of the men, Mr. Zeller, received burns.   James Conley's clothes were set on fire, and he was so severely burned that death followed the next day.   The elevator operator who was loading the sacks containing paper at the time, testified that the fire appeared to shoot out in a broad swath of flame from in front of the boilers and rise toward the ceiling.   Mr. Zeller testified that, when he stepped out of the repair room after the alarm was turned in, "the whole air was all burning, the air was all on fire."   There is evidence that the rags, in the refuse brought down from the top floors to the basement, had been used to wipe the printing presses and had been somewhat saturated with gasolene.   There was also testimony from an expert that vapors or gases from petroleum products are heavier than air. His opinion was that such gases sought the pit in front of the boilers, and that they were ignited from the fire in, or at, the boilers. Once ignited the flames would rise upward and spread.

The negligence charged by plaintiff was in failing to provide a reasonably safe place wherein to work, neglect to warn of the danger, and failing to provide proper means of escape in case fire arose. The defense was denial of negligence, and, affirmatively, contributory negligence, assumption of risk, and negligence of fellow servant.

From the facts recited, and others in the record, we are of the opinion that the defendant's negligence in permitting men to work in a deep basement surrounded by inflammable material, where gases and vapors from gasolene and benzine might reach a flame, and where the exit under the permitted conditions might become impeded

---

[1] See correction on page 190, infra.

and dangerous, was properly a jury question. Defendant, however, insists that the place was inherently safe and was only rendered dangerous through negligence of James Conley and his fellow servants in carrying out the details of the work, hence the master is not liable, citing Lundquist v. Duluth Street Ry. Co. 65 Minn. 387, 67 N. W. 1006; Northern Pac. Ry. Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983, 38 L. ed. 1009; Galloway v. Turner Imp. Co. 148 Iowa, 93, 126 N. W. 1033. This is undoubtedly good law. But, we think, in ascertaining whether a master has exercised ordinary care in providing and maintaining a reasonably safe place wherein the servants are to work, it is proper to consider not only the safety of the place in and of itself, but also as it becomes from the work therein carried on under the master's supervision. The duty is not only to provide a safe place, but to maintain it. Where inflammable materials are used, regard must be had to the precautions to be taken, and to the provisions for escape in case of mishap. The starting of the fire had, perhaps, not so much to do with Conley's death as the impeded and difficult exit from the basement. It is truly said, defendant was not required to anticipate improbable dangers. Boyd v. City of Duluth, 126 Minn. 33, 147 N. W. 710. But the dumping of waste from the printing establishment in the basement was not unusual. It was a daily occurrence, though generally done by the night janitor, and was burned about once a week, so nothing can be made from the fact that it might have remained a few hours in front of the boilers. That the windows in the basement would be closed on a cold day ought to be anticipated.

Nothing in the evidence requires us to hold, as a proposition of law, that Conley was guilty of contributory negligence or assumed the risk of the dangers from which he perished. It is true that, when he was raking out the ashes in which were live coals, the foreman told him to be careful. But the evidence does not indicate that the fire started from the coals, or that Conley was informed of the danger of gas ignition therefrom.

The contention that the proximate cause of Conley's death was conclusively shown to be the negligence of a fellow servant, in dumping the gasolene soaked waste in the boiler pit, cannot be sustained.

The court charged the jury that the elevator operator was Conley's fellow servant, and if the proximate cause of death was the negligence of the operator, or of any other fellow servant, there could be no recovery. The elevator operator testified that this waste was in cars placed on each floor, which, when filled, were set in front of the elevator shaft, and his duty was to take them to the basement and dump them in front of the boilers. He did so in this instance. There was nothing to contradict him, unless found in the circumstance that the disposition of waste from the printing presses was generally taken care of by the night janitor. Nor, as before stated, can it be said as a matter of law, that the starting of the fire was the sole proximate cause of the death of Conley. · The impeded condition of the exits may account for the fatality.

Error is assigned upon part of the charge. We think the charge, as a whole, very fair to defendant. This applies also to the portion excepted to, provided it is not taken out of its setting.

The damages to the widow and infant of $4,300 cannot be said to be excessive. James Conley was 38 years old, in good health, and supporting his family. To be sure, his vocation was only that of janitor and fireman of heating plants, at the small salary of $11 per week. But where the death is that of the head of the household, damages are not confined strictly to the probable pecuniary contributions to be expected from the deceased. Johnson v. C. A. Smith Lumber Co. 99 Minn. 343, 109 N. W. 810.

The order is affirmed.

On July 17, 1915, the following opinion was filed:

PER CURIAM.

The petition for reargument is denied.

However, a correction in the opinion filed should be made wherein it states: "Near the upper part of the stairway were doors, swinging into the basement and kept closed by weights. This impeded a hurried exit." No door is shown on the plat used at the trial, and from the description by different witnesses the situation in respect to the door or doors is somewhat confused (folios 124 and 334–342

of the printed record), but we take it the door or doors swung so that a person passing up from the basement pushed instead of pulled them open. After passing through the first door there seems to have been two other steps up, and then a double swinging door. The witness Zeller testified he had to pass through both doors before he got out of danger. We deem it of no controlling importance which way the door swung. The means of exit bore upon the question of safe place to work.

No question as to the statutory duty of providing fire escapes was submitted to the jury nor was it considered by this court to be involved in a determination of the appeal.

